UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MRS. UNITED STATES NATIONAL PAGEANT, INC.,


                                        Plaintiff,

                                                        <u>DECISION AND ORDER</u>

                                                        12-CV-6137L


                        v.

MISS UNITED STATES OF AMERICA
ORGANIZATION, LLC,
STEVEN GAMBRELL,
TAMMY JOHNS,


                                Defendants.
_____


        The maxim that "imitation is the sincerest form of flattery" may well be true, but in matters

of intellectual property, efforts at imitation are not always taken as a compliment, as they often lead

to a violation of property rights.  The case now before the Court provides an example of just such

a situation.

        This is a trademark dispute.  Plaintiff, Mrs. United States National Pageant, Inc., is a New

York corporation based in Fairport, New York, that operates beauty pageants throughout the country.

Plaintiff currently owns eight federally registered trademarks, including "Mrs. United States," and

seven other variants, all of which utilize the terms "United States" and the prefixes "Mrs.," "Miss,"

or "Ms."  Amended Complaint ("AC") (Dkt. #14) ¶ 11.

        Plaintiff has sued three defendants–Miss United States of America Organization, LLC,

Steven Gambrell, and Tammy Johns–alleging that defendants have infringed upon plaintiff's

trademarks, by means of defendants' commercial use of the term "Miss United States of America,"

and several variations and permutations of that name (such as "Mrs. United States of America" and

"Miss Teen United States of America").  In essence, defendants' challenged marks simply add the

tag-on phrase "of America" after the term "United States."  For example, one of plaintiff's protected marks is "Miss United States."  Defendants use that exact phrase but append "of America" to it in their mark, "Miss United States of America."  Defendants assert that this seemingly minor alteration amounts to a distinction that makes a genuine difference between the parties' marks.

Plaintiff alleges that defendants have announced and advertised their plans to conduct a pageant in Atlanta, Georgia in late July 2012, for the title of "Miss United States of America." Plaintiff also alleges that defendants have created a website to promote that pageant, www.missunitedstatesofamerica.com.  Based on those allegations, plaintiff asserts claims under the Lanham Act, 15 U.S.C. §§ 1114, 1125, as well as a number of claims under New York law.

Plaintiff has filed a motion to preliminarily enjoin defendants from using the allegedly infringing marks and internet domain name.  Defendants have filed a motion to dismiss the complaint for lack of personal jurisdiction and improper venue.  Plaintiff has also filed a motion to either deny defendants' motion to dismiss, or in the alternative to allow plaintiff to conduct jurisdictional discovery.

## BACKGROUND

According to the complaint, plaintiff's president, Isabella Ilacqua, has been involved in the beauty pageant business since 1985.  Under Ilacqua's direction, plaintiff has conducted the Mrs. United States pageant annually for the past twenty-five years.  AC ¶ 12.  Plaintiff also owns and operates an internet site to advertise its pageants, using the domain name www.mrsunitedstates.com. AC ¶ 14.

Defendant Johns was a contestant in, and ultimately the winner of plaintiff's 2009 Mrs. United States pageant.  In 2011, at that year's Mrs. United States pageant in Las Vegas, Nevada, Johns allegedly approached Ilacqua and asked her whether she would consider selling some of plaintiff's trademarks to Johns.  Ilacqua replied that she was not interested in any deal along those

lines.  Later that month, Johns and defendant Gambrell, a former state director for plaintiff, repeated Johns's offer in writing, and Ilacqua again refused.  AC ¶¶ 21-23.

In September 2011, Johns and Gambrell formed the defendant entity, Miss United States of America, LLC, in South Carolina, which is also where Johns and Gambrell reside.  Johns is the president, and Gambrell is the Chief Executive Officer of that entity.  AC ¶¶ 9, 10.  They also registered a website, under the domain name www.missunitedstatesofamerica.com.

The following month, defendants filed applications for the trademarks "Miss United States of America" and "Mrs. United States of America."  AC ¶¶ 33, 34.  Defendants have stated on their website that the Miss United States of America pageant, which will include contestants from all fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, will be held on July 22-28, 2012, in Atlanta.  AC ¶¶ 34, 35.

Plaintiff commenced this action on March 16, 2012, and filed an amended complaint on April 25.  Plaintiff asserts claims for trademark infringement, unfair competition under New York law, breach of contract, and "cybersquatting," as explained in more detail below.  Plaintiff seeks injunctive relief, and in the alternative, damages.  Plaintiff's motion for a preliminary injunction seeks an order restraining defendants from using their various "United States of America" marks, and from using the domain name "missunitedstates.com."

In their motion to dismiss, defendants contend that this Court lacks personal jurisdiction over them.  They state that they have never transacted business in New York, that they have no office or residence in this state, and they have not consented to jurisdiction here.  Defendants further contend that there is no evidence that the website has been purposefully aimed at New York residents.

**DISCUSSION**

**I. Personal Jurisdiction**

As in any action, the Court cannot reach the merits of the plaintiff's claims until it is satisfied that it has jurisdiction over both the subject matter and the defendants themselves. *See, e.g., In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267–68 (2d Cir.2001) (treating personal jurisdiction as a threshold determination that precedes adjudication of the merits). At this early stage of the case, however, "plaintiffs need only make a prima facie showing of personal jurisdiction over the defendants," and the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008). "[P]laintiff[s'] prima facie showing ... must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (second alteration in original). *See also Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 563 (S.D.N.Y. 2000) ("Citigroup's burden at this stage of the proceedings is to establish a *prima facie* case for jurisdiction over City Holding").

In general, a "district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010). This Court therefore looks to New York law in determining whether personal jurisdiction may be had in New York over the defendants, although there is also a federal constitutional component to this analysis, as explained below.

To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the court engages in a two-step analysis. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243-44 (2d Cir. 2007). First, the court applies the forum state's long-arm statute. *See id.* at 244; *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).

If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution. This second analysis has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. With respect to minimum contacts, the court must determine whether the defendants have sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

For purposes of this inquiry, courts distinguish between "specific" and "general" jurisdiction. "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state, and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* (citing *Helicopteros Nacionales*, 466 U.S. at 414-15 n. 9).

The "reasonableness" inquiry requires the Court to decide "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'–that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir.) (quoting *Chloé*, 616 F.3d at 164), *certified question accepted*, 18 N.Y.3d 952 (2012).[1]   In determining the reasonableness of a particular exercise of jurisdiction, a court must consider:  (1) the burden on the defendant, (2) the interests of the forum State; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared

---

[1]The New York Court of Appeals accepted two questions certified by the Second Circuit in *Licci*, the resolution of which will not affect the outcome in this case, concerning a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and the use of that account to effect "dozens" of multimillion dollar wire transfers on behalf of a foreign client. *See* 673 F.3d at 75.

interest of the several States in furthering fundamental substantive social policies.  *Chloé*, 616 F.3d at 173 (citing *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 113 (1987)).

The New York long-arm statute does not extend in all respects to the constitutional limits established by *International Shoe* and its progeny.  *See, e.g.*, *Best Van Lines*, 490 F.3d at 244-45 & n. 8 (noting "gaps" between the jurisdiction conferred by the New York long-arm statute and that permissible under the federal Due Process Clause); *Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.*, 62 N.Y.2d 65, 71 (1984) ("in setting forth certain categories of bases for long-arm jurisdiction, [the New York long-arm statute] does not go as far as is constitutionally permissible").  "Where ... the plaintiffs premise their theory of personal jurisdiction upon the New York long-arm statute, [the court should therefore] first consider whether the requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause."  *Licci*, 673 F.3d at 61.


## II. Application to this Case

In the case at bar, I conclude that plaintiff has made a sufficient showing of personal jurisdiction over defendants, both under New York's long-arm statute and as a constitutional matter. The record before me indicates that defendants have deliberately reached into New York, primarily through the operation of their website, and that defendants' allegedly tortious acts caused an injury to plaintiff within this state.

The New York long-arm statute states, in part, that a New York "court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state," provided that the defendant "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  C.P.L.R. § 302(a)(3).

While this test has long been established, its application to cases involving the operation of a website is still evolving. The basic governing principles are no different in internet cases, however; "traditional statutory and constitutional principles remain the touchstone of the inquiry," and the analysis that has been developed simply "applies traditional principles to new situations." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa. 1997)) (additional internal quotation marks omitted).

In internet cases, the analytical framework that has evolved employs a sliding scale, based on the degree to which the defendant has used the internet in its commercial or other relevant activities. At one end of that scale is the creation or maintenance of a purely "passive" website, which "does little more than make information available to those who are interested in it" or the information that it contains. At the opposite end of the spectrum are defendants who enter into contracts, or otherwise interact with residents of other jurisdictions, that "involve the knowing and repeated transmission of computer files over the Internet." *Best Van Lines*, 490 F.3d at 251 (quoting *Zippo*, 952 F.Supp. at 1124).

What is most pertinent here is the "middle ground[, which] is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* This middle ground covers a wide range of websites, including those where a user can purchase products online, establish an online account, communicate with the owner of the site or its representatives, or download order forms or other documents. *See Skrodzki v. Marcello*, No. 10–CV–5191, 2011 WL 3665152, at *13 (E.D.N.Y. Aug. 19, 2011) (collecting cases). "Generally, an interactive website supports a finding of personal jurisdiction over a defendant." *Iovate Health Sciences, Inc. v. Masuda*, No. 08-CV-809, 2009 WL 2878526, at *4 (W.D.N.Y. 2009).

In the case at bar, defendants' website clearly falls into that middle ground. The home page contains several links, one of which is titled, "Become A Contestant." By clicking on that link, the

user is taken to a page containing links (in PDF and Word formats) for downloading an application form to become a contestant in the 2012 pageant.  That page also contains information about how and where to submit an application, as well as an email address for contacting defendants "[i]f you are interested in becoming a director in your state ... ."

Another link on the home page is entitled "Contact Us."  That page contains a form by which a user can submit his or her name to "the national e-mail," as well as defendants' email address and phone number.  A link at the bottom of the page, entitled, "Payment Options," provides an online form where the user can submit credit card and other personal information, as well as a postal address for sending payment by ordinary mail.

At the bottom of each page on defendants' website is a link labeled "Store."  That link takes the user to a website, http://www.cafepress.com/missunitedstatesofamericaorganization, where the user can purchase various items, such as keychains, T-shirts, a "keepsake box," and so on, bearing the Miss United States of America name and logo.  Plaintiffs have submitted an affidavit of one Daniel P. Finnerty, who states that on May 27, 2012, he accessed defendants' website and, through their online store, purchased three coffee mugs, bearing the words and logos for "Miss United States of America," "Miss Teen United States of America," and "Mrs. United States of America." Dkt. #27 ¶ 6.

Another link on the home page, bearing the title, "2012 Contestants," displays the flags of the fifty-three jurisdictions from which defendants seek contestants.  The current version of that page appears to be a static display of those images with the names of the states listed underneath each flag.[2]

--------

[2]It appears from plaintiff's exhibits that at some point after this litigation began, defendants altered that page to add the word "Unavailable" under the New York flag, *see* Dkt. #25-3 at 10, in what seems to have been a belated attempt to avoid jurisdiction in New York. This Court's focus, however, must be on whether jurisdiction existed at the time of the filing of this action.  *See In re Terrorists Attacks on September 11, 2001*, 740 F.Supp.2d 494, 507 (S.D.N.Y. 2010); *Allen v. Russian Federation*, 522 F.Supp.2d 167, 194 (D.D.C. 2007).

(continued...)

In my view, and given plaintiff's relatively light burden of making out a *prima facie* showing of jurisdiction, I conclude that there is enough evidence to establish personal jurisdiction in this case. The evidence suggests that defendants sought to solicit contestants from New York (as well as from the other forty-nine states), and that through their website, they provided a means, through downloadable forms, for New York residents to become contestants in defendants' pageant.  Such activity indicates that defendants knowingly and purposefully reached out to New York residents in furtherance of their pageant business.  *See Sleep Science Partners v. Lieberman*, No. C 09-04200, 2009 WL 4251322, at *5 (N.D.Cal. Nov. 23, 2009) (defendant's maintenance of an interactive website that allowed people to fill out a prescription survey and purchase its products online constituted the "purposeful availment" of the privilege of conducting activities in California); *cf. A.W.L.I. Group, Inc. v. Amber Freight Shipping Lines*, 828 F.Supp.2d 557, 568 (E.D.N.Y. Dec. 9, 2011) (noting that plaintiff did not allege that defendant transacted business through its website, or that customers could download or fill out forms associated with the purchase of defendant's services through the website, and therefore finding defendant's website to be "passive").  Defendants have also indicated on their website that they are seeking a state director for each state, and their site allows New York residents to purchase their products (which bear the allegedly infringing mark) online.

Although defendants contend that there is no evidence that they have "targeted" New York, I do not believe, on the facts presented, that it would be sensible, or equitable, to interpret the references in the case law to "targeting" a jurisdiction as meaning that the defendants must have *singled out* New York as a particular focus of their commercial activity.  Through their website,

---

[2](...continued)
As of the date of this Decision and Order, the image of the New York flag no longer bears the words, "Not Available."  Thus, the "2012 Contestants" page now simply displays unadorned images of all the states' flags and names.  On a prior version of the page, however, some state flags had superimposed over them the words "Mrs. Crowned!," "Miss Coming Soon!," and similar phrases, which apparently indicated whether a state winner had yet been chosen for that state.  *See* Dkt. #25-3 at 6.

defendants have solicited business from a nationwide base of potential consumers; the "Become A Contestant" page on their site lists all fifty states, with the instructions after each to "[c]ontact national office for title," thus indicating that defendants seek contestants from every state in the union.[3]  If defendants choose to reach out in that way to each state, they should not be heard to complain if they are haled into court in one of those states as a result of that activity.  *See Dedvukaj v. Maloney*, 447 F.Supp.2d 813, 820 (E.D.Mich. 2006) ("Sellers cannot expect to avail themselves of the benefits of the internet-created world market that they purposefully exploit and profit from without accepting the concomitant legal responsibilities that such an expanded market may bring with it"); *Coremetrics, Inc. v. Atomic Park.com, LLC*, 370 F.Supp.2d 1013, 1022 (N.D.Cal. 2005) ("although AtomicPark may not have targeted California consumers specifically, it has reached out across the nation to promote its services"); *Ty, Inc. v. Baby Me, Inc.*, No. 00 C 6016, 2001 U.S. Dist. LEXIS 5761, at *23 (N.D.Ill. Apr.25, 2001) (stating that, because "advertising on the Internet targets no one in particular and everyone," defendant could not "shield itself from suit by claiming that a web site which invites orders from customers in Illinois (as well as elsewhere) was not directed at Illinois residents").

Indeed, the very nature of defendants' business–a beauty pageant, designed to select a *national* winner–reinforces the conclusion that defendants have not simply solicited business nationwide, in a general sense, but that they have "targeted" every state.  As is evident from defendants' website, the whole premise of such a competition is that, ideally, at the national pageant each state will be represented by one contestant, so that the eventual winner can legitimately claim to hold a truly national title.  To give the competition some legitimacy, then, it is clearly better, from

---

[3]As of this writing, the website lists two women after the names of three states each.  It appears that those two women are the contact persons for those particular states.  Applicants from the other 47 states and territories are directed to "[c]ontact [the] national office" if they are interested in becoming a contestant.

defendants' standpoint, to have at least one person submit an application from each state and territory, than to have fifty-three entrants apply from a single state.[4]

In that sense, then, this case is different from those in which a website simply *could* be accessed by a user from a given state, where the defendant had no particular interest in soliciting business from that state. *See, e.g., BE2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011) (finding no evidence that defendant's online dating service deliberately targeted Illinois market). Defendants' own website indicates their wish to have at least one contestant from each state.

Plaintiff's allegations of trademark infringement will be addressed below, but assuming *arguendo* that defendants have infringed plaintiff's mark, that also adds weight to the conclusion that defendants have "targeted" New York. In a case involving alleged misappropriation of materials from the plaintiff's website, the Court of Appeals for the Ninth Circuit stated that

> the "express aiming" requirement ... is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state. More directly pertinent here, "we have held that the 'expressly aimed' prong of the purposeful direction test can be met where a plaintiff alleges that the defendant individually targeted him by misusing his intellectual property on the defendant's website for the purpose of competing with the plaintiff in the forum."

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (quoting *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 609 n.4 (9th Cir. 2010)) (additional internal quotes omitted). In that sense, defendants here can be said to have "targeted" New York by infringing on trademarks owned by plaintiff, a New York resident, for the purpose of promoting what amounts to a rival pageant.

In that regard, the decisions by the Second Circuit and the New York Court of Appeals in *Penguin Group (USA) Inc. v. American Buddha* are of particular relevance. In *American Buddha*, the Second Circuit certified to the New York Court of Appeals the question, "In copyright

---

[4]It also seems reasonable to assume that the more populous the state, the more important it would be for defendants to have a representative from that state. It requires no great stretch to think that the absence at defendants' pageant of a representative from New York would be a rather glaring omission.

infringement cases, is the situs of injury for purposes of determining long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii) the location of the infringing action or the residence or location of the principal place of business of the copyright holder?" 609 F.3d 30, 32 (2d Cir. 2010).

The New York Court of Appeals "narrow[ed] and reformulate[d]" that question, limiting its scope to "copyright infringement cases involving the uploading of a copyrighted printed literary work onto the Internet ... ." 16 N.Y.3d 295, 301 (2011). The court concluded that "a New York copyright owner alleging infringement sustains an in-state injury pursuant to CPLR 302(a)(3)(ii) when its printed literary work is uploaded without permission onto the Internet for public access." *Id.* at 304.[5]

Despite the New York Court of Appeals' limitation of the scope of its holding, *American Buddha* is instructive in the case at bar. Of particular note are that court's observations that "the alleged injury in this case involves online infringement that is dispersed throughout the country and perhaps the world," *id.* at 305, and that it was an "'undisputed' fact that 'American Buddha's Web sites are accessible by any New Yorker with an Internet connection." *Id.* at 306.

I do not read *American Buddha* as holding that personal jurisdiction may always be had over the defendant in any intellectual property case involving the use of the internet, where the owner of that property resides in New York. The Court of Appeals expressly disavowed any such holding, stating that the long-arm statute's "built-in safeguards against such exposure," together with the requirements of the Due Process Clause, would guard against such abuse of the long-arm statute. *Id.* at 307. But *American Buddha* does support the conclusion that the defendants' allegedly wrongful activities in the case at bar caused an injury within this state, which was reasonably foreseeable by the defendants.

---

[5]Following the New York Court of Appeals' decision answering its certified question, the Second Circuit vacated the district court's judgment dismissing the plaintiff's complaint, and remanded the case for further proceedings. 640 F.3d 497, 501 (2d Cir. 2011).

The fact that defendants are engaged in the same type of business as plaintiff, and presumably compete for a finite field of contestants, audience members and advertisers, further supports a finding of jurisdiction in New York. That is particularly so inasmuch as defendants' infringing acts are alleged to have been taken in bad faith and with full knowledge of plaintiff's preexisting trademarks. *See Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 122 (E.D.N.Y. 2000) (stating that "[w]here intentional misconduct is at issue, the wrongdoer should reasonably anticipate being called to answer for its conduct wherever the results of that conduct are felt," and that since defendant was "alleged to have directed identical deliberate tortious conduct at the residents of every state in the union, ... personal jurisdiction over BAT extends to cover all of the plaintiffs' claims since all may be said to 'arise out of or relate to' BAT's contacts with New York").

It is also significant that defendants' website permits users to purchase defendants' products, which bear the allegedly infringing marks, online. With respect to the purchase of three coffee mugs by someone acting on plaintiff's behalf, defendants argue that plaintiffs cannot "reach back to capture jurisdiction," Def. Mem. (Dkt. #36) at 6, but more to the point, defendants do not appear to dispute that the same purchase could have been made prior to plaintiff's filing of the complaint in this case.

While actual sales in a given state, predating the filing of a complaint, constitute evidence that a defendant has availed itself of that state's jurisdiction, such sales are not a *sine qua non* of jurisdiction. The focus, for purposes of determining whether personal jurisdiction exists, should be on the *defendants'* activities and intent vis-a-vis the state in question, not on whether any particular consumers from that state have responded to defendants' solicitations. To rule otherwise could lead to a result in which two defendants could engage in virtually identical conduct, targeting one or more states through an internet site, but only one of them would be subject to jurisdiction in a given state, based on the purely fortuitous circumstance that someone from that state initiated an online transaction with that defendant. Again, the primary question for determining whether jurisdiction is proper here is whether defendants intentionally solicited contestants and customers from New

- 13 -

York, regardless of whether anyone from New York actually responded to defendants' solicitations. *See Wine Group LLC v. Levitation Mgmt., LLC*, No. CIV. 2:11–1704, 2011 WL 4738335, at *8 (E.D.Cal. Oct. 6, 2011) (since "defendants' business plan [wa]s to target all fifty states, including California," and since "[d]efendants placed their website online with 'every reason to believe prospective [customers] in [the forum] would see the website–indeed, attracting new business was the point,'" plaintiff's allegations were enough to support a finding that jurisdiction existed) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1130 (9th Cir. 2010)); *New Angle Pet Products, Inc. v. MacWillie's Golf Products, Inc.*, No. 06-CV-1171, 2007 WL 1871345, at *3 (E.D.N.Y. June 28, 2007) (finding jurisdiction in part because "[d]efendant's websites enable the viewer to purchase [its] product on-line by providing payment and shipping information.  They also provide an e-mail address, phone number, and facsimile number as contact information").  *Cf. American Buddha*, 16 N.Y.3d at 306 (viewing the "absence of any evidence of the actual downloading of Penguin's four [copyrighted] works by users in New York" as "not fatal to a finding that the alleged injury occurred in New York").

Based on all the evidence recited above, I therefore conclude that plaintiffs have made a sufficient showing of personal jurisdiction over defendants.  It is therefore unnecessary for the Court to consider plaintiff's additional arguments that jurisdiction is proper here based on Johns's 2009 Title Holder Agreement ("Agreement"), which provides at § H(6):

> This Agreement shall be construed in accordance with the internal laws of the State of New York.  The venue for any proceedings relating to the provisions hereof, or the construction, interpretation, or enforcement thereof, or any breach or alleged breach thereof, shall take place in the City of Rochester, State of New York, regardless of the forum in which the agreement or any part thereof may have been negotiated or executed.

Amended Complaint Ex. A (Dkt. #14 at 26).

I note, nevertheless, that this provision does seem quite explicitly to provide for venue here. Oddly, in their initial brief in support of their motion to dismiss, defendants contended that Johns's contract "does not contain a forum selection clause." Dkt. #19 at 3.  Defendants appear to have since

abandoned that argument, and instead now argue that § H(6) does not cover a trademark dispute arising two years after the contract's termination. *See* Def. Reply Mem. (Dkt. #36) at 11-12.

Section A(4) of the Agreement expressly provides, however, that Johns agreed that upon the expiration of the Agreement, which occurred in 2010, *see* Agreement § A(1), "any rights of the Title Holder to ... trademarks, names, logos, etc. [associated with plaintiff's pageant] shall expire and terminate," and that Johns would "immediately discontinue use of such names, logos, and marks, etc. ... ." She further agreed in § A(5) that "upon the expiration of her reign [in 2010], ... she may only be referred to as the former Mrs. United States, or the year of her reign [sic]." Dkt. #14 at 23.

In light of those provisions, it is difficult to see how plaintiff's current claims in this litigation do not constitute "proceedings relating to the provisions" of the Agreement, within the scope of the forum selection clause in § H(6). While defendants contend that Johns has not violated the restrictions placed upon her in § A(4), that goes to the merits of plaintiff's claims, and not to the enforceability of the forum selection clause. Although my findings concerning defendants' website are enough to support a finding of personal jurisdiction in this case, I also find that the contract between plaintiff and Johns also supports such a finding, at least as to defendant Johns.[6]

---

[6]Since defendants have apparently conceded that the Agreement does contain a forum selection clause, it is not clear if they continue to press their argument that venue here is improper. I conclude, however, that venue in this district is proper under 28 U.S.C. § 1391(b)(1), which states, in relevant part, that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Courts in trademark infringement cases have held that venue may be proper "in each jurisdiction where infringement is properly alleged to have occurred." *Mattel, Inc. v. Adventure Apparel*, No. 00 CIV. 4085, 2001 WL 286728, at *4 (S.D.N.Y. Mar. 22, 2001) (internal quotation marks and citation omitted). "At a minimum, the defendant must have targeted its marketing and advertising efforts at the district in question, or have actually sold its products there." *Id.* "When the marketing activity or sale occurred via the internet, courts in New York apply the same principles which govern whether a website confers personal jurisdiction." *EnviroCare Technologies, LLC v. Simanovsky*, No. 11–CV–3458, 2012 WL 2001443, at *5 (E.D.N.Y. June 4, 2012). Based on my findings as to personal jurisdiction, then, I also conclude that venue is proper in this district.

**III. Plaintiff's Motion for a Preliminary Injunction**

**A. Trademark Infringement Claim**

In the Second Circuit, where a party seeks preliminary injunctive relief in an action alleging trademark infringement under the Lanham Act, courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 390 (2006). Under that standard, preliminary injunctive relief should issue where the plaintiff has established a likelihood of success on the merits, and that: (1) plaintiff is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate plaintiff for that injury; (3) the balance of hardships tips in plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay*, 547 U.S. at 391). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted).

Although irreparable harm may not be presumed upon a showing of a likelihood of success, *see eBay*, 547 U.S. at 393; *Salinger*, 607 F.3d at 80, "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515, 540 (S.D.N.Y. 2011). Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm. *See Marks Org., Inc. v. Joles*, 784 F.Supp.2d 322, 334 (S.D.N.Y. 2011) (stating that "although a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury," and that "[a] plaintiff may also show a threat of irreparable injury by showing a threatened loss of good will and loss of ability to control its reputation").

To establish a likelihood of success on a claim for trademark infringement, a plaintiff must show that the defendants' use of the allegedly infringing marks is likely to cause consumer

confusion.  Courts in the Second Circuit typically begin the analysis by considering the following non-exclusive list of factors:

> (a) the strength of the plaintiff's mark; (b) the degree of similarity between the plaintiff's and the defendant's marks; (c) the proximity of the products; (d) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (e) the sophistication of the buyers; (f) the quality of the defendant's product; (g) actual confusion; and (h) good or bad faith.

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (Friendly, J.)).

In the case at bar, I conclude that plaintiff has established its entitlement to preliminary injunctive relief.  I find that plaintiff has established a likelihood of success on the merits of its trademark claims, as well as a risk of irreparable harm in the absence of an injunction.

Defendants correctly assert that the beauty pageant industry is a "crowded field," as it has been for some time.  *See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("We view the beauty pageant industry's marks as a 'crowded field'").  Defendants' brief lists twelve pageants, in addition to plaintiff's, that use marks employing some combination of "Miss" or "Mrs." and "United States" or a similar designation, often in combination with other modifiers:  "Mrs. United America," "Miss Latina United States," "Miss United States National Forestry," and so on.  Wikipedia also lists over two dozen national beauty contests in the United States, employing a wide variety of names.

In general, "[i]n a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."  *Id.* at 1449.  The fact that the relevant field of marks is "crowded," however, does not mean that a given mark within that field is entitled to *no* protection, or that competitors have carte blanche to utilize names that mimic preexisting marks. *See id.* at 1450 ("There are, of course, limits to the 'crowded field' analysis"); *NSM Resources Corp. v. Target Corp.*, 636 F.Supp.2d 857 (D.Minn. 2008) (finding that plaintiff's "HUCK" mark was entitled to lesser protection due to extensive use by third parties of the word "huck," but nevertheless concluding that the "strength" factor favored plaintiff, even if only slightly).  *See also Robert Bosch*

- 17 -

*LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) ("It is well-established that the 'fact that other infringers may be in the marketplace does not negate irreparable harm'") (quoting *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1381 (Fed.Cir. 2005)).  Were it otherwise, it would be pointless to register a mark in a crowded field, and competitors could eventually erode the strength of a given mark to the point where it is rendered completely ineffective or unenforceable.

Perhaps in part because of the number of competing pageants, and the continued entry of new players into the arena, the beauty pageant industry has also generated a fair number of lawsuits over the years, as reflected in the reported cases.  In a series of cases spanning nearly two decades, the Court of Appeals for the Second Circuit addressed a number of claims concerning alleged infringement of various marks, including "Miss Universe," "Miss U.S.A.," and "Miss World."  *See Miss Universe, Inc. v. Patricelli*, 386 F.2d 997 (2d Cir. 1967) ("*Miss Universe I*") (per curiam), and 408 F.2d 506 (2d Cir. 1969) ("*Miss Universe II*"); *Mecca Limited v. Patricelli*, 595 F.2d 1209 (2d Cir. 1979); *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 238 (2d Cir. 1985) ("*Miss Universe III*").

In those various decisions, the Second Circuit held that some of the challenged marks infringed some of the plaintiffs' marks (*e.g.*, "Miss World-U.S.A." and "Miss Venus World USA" infringed "Miss World"), but that others did not (*e.g.*, neither "Miss World-U.S.A." nor "Miss Venus-U.S.A." infringed "Miss U.S.A.").  As in most trademark cases, the court's emphasis was on the likelihood that the names would create confusion among consumers.  *See*, *e.g.*, *Miss Universe III*, 753 F.2d at 237-38; *Miss Universe II*, 408 F.2d at 509-11.

While the court gave a number of reasons for its varied results, one key seems to have been the presence, in some of the marks, of a "different distinguishable major element."  For example, in *Miss Universe II*, the court stated that

> such designations as 'Miss U.S.A.-World' share a ... high probability of confusion, because appellee's primary title 'Miss U.S.A.' remains intact, subject only to the additional word which need not have a qualifying meaning in the minds of consumers.  On the other hand, the mark 'Miss World-U.S.A.' is, on its face, dominated by the distinguishable major element, 'Miss World' and does not share the same tendency toward confusion.

408 F.2d at 510.   Along those same lines, in *Miss Universe III*, the court found that the word

"'Venus' inserted between the words 'Miss' and 'U.S.A.' satisfied our requirement in [*Miss*

*Universe II*] that a different distinguishable major element be placed between the primary words

allegedly infringed upon."   753 F.2d at 238.

Those cases, while instructive, did not create a simple litmus test for determining whether

a given mark infringes another mark.   *See Miss Universe, L.P. v. Villegas*, 672 575, 587 (S.D.N.Y.

2009) ("The Second Circuit has declined to hold that *all* marks formed by inserting a distinguishable

major element between 'Miss' and 'USA' do not infringe 'Miss USA'").   Rather, the question of

confusion, like trademark infringement in general, must be determined on a case-by-case basis.   *See*

*New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, No. Civ.3:02CV173, 2003 WL 23507022,

at *2 (D.Conn. May 8, 2003) (citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269

F.3d 114, 119 (2d Cir. 2001)); *see also In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012)

("Whether a likelihood of confusion exists is determined on a case-by-case basis").

In the instant case, I conclude that plaintiff has shown a likelihood of confusion among the

relevant consumers, in the absence on an injunction.   In that regard, I find that the degree of

similarity between the parties' marks is high.

The chief, if not only, difference between the competing marks here is defendants' addition

of the words "of America" after "United States."   That is not, however, a "different distinguishable

major element" in the sense used in the Second Circuit's *Miss Universe* cases.

Again, while those cases are not on all fours with this one, they are instructive.   In *Miss*

*Universe III*, for example, the court emphasized the insertion of a proper noun, "Venus," between

the words "Miss" and "U.S.A," in support of its finding that there was little likelihood of consumer

confusion.   *See* 753 F.2d at 238.   Likewise, in *Miss Universe II*, the court found a "high probability

of confusion" where the plaintiff's mark, "Miss U.S.A.," remained intact in the defendant's mark,

subject only to the additional word "World" appended at the end, but that the title, "Miss

World-U.S.A." was dominated by the distinguishable major element, "Miss World," and therefore would not tend to confuse consumers.  408 F.3d at 510.

Here, the addition of the words, "of America" does not significantly distinguish defendants' marks from plaintiff's.  Not only are those words added *after* the words "United States," but they do not qualify or distinguish those marks, because "United States" is commonly understood to be a shortened version of, and equivalent to, "United States of America."  It seems quite likely, therefore, that consumers (primarily beauty pageant fans) would tend to confuse the parties' marks with each other, and to assume that the parties' respective pageants are either the same, or at least related to each other in some way.

I conclude, then, that there is a high degree of similarity between the parties' marks.  As to the other relevant factors, the parties' "products"–female beauty contests–share the same marketplace.  "Bridging the gap" is therefore irrelevant here, since both parties are in the same business.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 387 (2d Cir. 2005), *cert. denied*, 547 U.S. 1019 (2006).  I also assign little or no weight to the "quality" factor, as there is nothing in the record before me, at this stage of the proceeding, suggesting a significant disparity in the relative "quality" of the two sides' pageants.

Although the plaintiff's mark may not be as strong as some better-known, longer-established contests, such as the Miss America or Miss USA pageants, plaintiff has been conducting such contests for far longer than defendants, whose pageant is a newcomer to the market.  While plaintiff's mark may not be particularly strong in its own right, then, it is presumably strong, relative to defendants' marks.

As to the sophistication of the relevant consumers, undoubtedly some beauty competition aficionados are aware of the various pageants that exist, and would know that many of them are unrelated to each other.  Most potential advertisers will also presumably take steps to ensure that they

understand the nature of a given pageant, and who is organizing it, before agreeing to sponsor the event.

At the same time, many casual observers and beauty pageant fans may not be aware that the "Mrs. United States" and "Mrs. United States of America" pageants are unrelated. Given that the terms "United States" and "United States of America" are often used interchangeably, in common parlance, it would not be surprising if many members of the public would assume that the parties' pageants were not only connected in some way, but that they were one and the same. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 283 (3d Cir. 1991) (when dealing with "mixed buyer" classes, in which some buyers are relatively knowledgeable about the product and others are not, "the standard of care to be exercised by the reasonably prudent purchaser [for purposes of likelihood-of-confusion analysis] will be equal to that of the least sophisticated consumer"); *see also Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (instructing that, where a product is targeted both to discriminating and casual buyers, a court must consider the likelihood of confusion on the part of the relatively unknowledgeable buyers as well as of the former group).

There is also some evidence here of actual confusion on the part of the public. Plaintiff has submitted evidence that during in April 2012, a Connecticut television station broadcast an interview of two participants in plaintiff's pageants. The backdrop for the interview (which was apparently created by the television station) displayed both the Miss United States and Miss United States of America logos, thus suggesting that the station employees who created that background were unaware that the logos were for two different, unrelated pageants. *See* Aff. of Christopher W. Wilmer (Dkt. #12-1) ¶¶ 3-5 and Ex. A.

In addition, plaintiffs have submitted an affidavit of Ashley Leach, the reigning Miss Connecticut United States 2012, whose title was conferred on her by plaintiff. She states that after winning the Miss Connecticut United States contest, she asked her hometown of Danbury to sponsor her travel expenses to plaintiff's 2012 national pageant for the title of Miss United States. Leach

states that although the supporting documentation that she submitted to the city finance department clearly indicated that the check should be made out to the plaintiff, the city delivered to her a check made out to "Miss United States of America Org." *See* Dkt. #32. Leach states that she returned that check and secured a replacement, correctly made payable to plaintiff.

I also note that on page seven of their memorandum of law in opposition to plaintiff's motion for a preliminary injunction (Dkt. #22), defendants state that "[p]laintiff abandoned its registration for "Mrs. United States" on May 8, 2007. It seems quite clear, from the context of that statement, that what defendants meant to say is that plaintiff abandoned its application to register "Mrs. United States *of America*," not "Mrs. United States."[7] The fact that defendants, or their attorneys–who are certainly aware of the difference between the two pageants–could make such a misstatement further demonstrates the ease with which the parties' marks can be confused with each other.

On this record, I do not give much weight to the good-or-bad faith factor. Nevertheless, I do note that while defendants' marks are not identical in all respects to plaintiff's, the sequence of events, as related by plaintiff's president, Isabela Ilacqua, suggests that defendants may not have acted entirely in good faith in adopting their marks. According to Ilacqua, Johns, herself a former Mrs. United States, attempted to purchase at least some of plaintiff's trademarks, and shortly after she was rebuffed, Johns, together with Gambrell, formed their competing organization, with its allegedly infringing marks. One could infer from those allegations that defendants, having failed to obtain plaintiff's marks by lawful means, simply began using marks that were exceptionally close to plaintiff's, with full knowledge that their own marks were at least skirting the line of what was permissible.

---

[7]In 2006, plaintiff filed an application to register the "Mrs. United States of America" mark. Plaintiff ceased to prosecute that application in 2007. Plaintiff contends that this was a "business decision" and did not constitute or imply an abandonment by plaintiff of any rights it may have held in the "Mrs. United States of America" mark. *See* Plaintiff's Reply Mem. (Dkt. #33) at 4.

On balance, then, the *Polaroid* factors tend to show a likelihood that plaintiff will succeed on the merits. I also conclude that the other relevant factors favor the issuance of a preliminary injunction.

It is unclear whether a court may presume irreparable harm upon a finding of likelihood of success on a trademark claim. The Supreme Court has held that such a presumption is improper in patent or copyright cases, *see eBay*, 547 U.S. at 392 (noting that Court's ruling with respect to patent cases "is consistent with our treatment of injunctions under the Copyright Act"); *see also Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) ("under *eBay*, a presumption of irreparable harm is equally improper in a case based on copyright infringement as it is in a case based on patent infringement"); *Salinger*, 607 F.3d at 82 ("After *eBay*, ... courts must not simply presume irreparable harm") (copyright case). To date, however, no consensus has emerged as to whether that holding applies to trademark infringement cases as well. *See Peoples Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 n.11 (1st Cir. 2012) (finding it unnecessary, and declining, to decide issue); *Southern Co. v. Dauben Inc.*, 324 Fed.Appx. 309, 318 n.13 (5th Cir. 2009) (same); *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008) (same).

At least some district judges from within this circuit have applied *eBay* to trademark cases, however. *See, e.g., Ascentive, LLC v. Opinion Corp.*, ___ F.Supp.2d ___, 2011 WL 6181452, at *5 (E.D.N.Y. 2011) ("Although prior to *Salinger*, courts in this circuit presumed irreparable injury in trademark cases where a likelihood of confusion was shown, post-*Salinger*, this presumption is no longer applicable"); *Tecnimed SRL v. Kidz–Med, Inc.*, 763 F.Supp.2d 395, 402 (S.D.N.Y. 2011) (applying *Salinger* to a trademark claim), *aff'd*, 462 Fed.Appx. 31 (2d Cir. 2012). The Second Circuit has not yet spoken directly on this question, though it has suggested that the presumption may still have some force in trademark cases; *see Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246-47 (2d Cir. 2009) (noting presumption in trademark cases, without referencing *eBay* or *Salinger*, but finding that even without benefit of presumption, plaintiff had shown irreparable injury).

Even without the benefit of such a presumption, however, plaintiff has shown that it is likely to suffer irreparable injury absent an injunction. Plaintiff has demonstrated not only a likelihood of confusion, but actual confusion among consumers with respect to the parties' respective marks and pageants. The potential loss of good will and customers by plaintiff, and possible damage to its reputation, as a result of defendants' alleged infringement of plaintiff's marks is not easily quantifiable or remediable by damages, and supports a finding of irreparable harm. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co. Inc.*, No. 07–CV–2568, 2012 WL 1414872, at *5 (E.D.N.Y. Jan. 20, 2012). In addition, courts have held that a trademark owner's loss of control over its mark, due to the existence of an infringing mark, can give rise to irreparable harm, for which remedies at law would not provide adequate compensation. *See CJ Products LLC v. Snuggly Plushez LLC*, 809 F.Supp.2d 127, 156 (E.D.N.Y. 2011); *United Stats Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515, 540 (S.D.N.Y. 2011)).

The balance of hardships, and the public interest, also weigh in favor of the issuance of an injunction. While an injunction will likely cause some hardship to defendants, inasmuch as their pageant is currently scheduled to take place in late July, defendants' continued use of the allegedly infringing marks would put in jeopardy the good will and reputation that plaintiff has developed over some two and a half decades. There is also no evidence before the Court that defendants could not go forward with their pageant, under a clearly non-infringing mark. *See Miss Universe II*, 408 F.2d at 510 (noting that court had previously suggested the use of a non-infringing mark). In addition, to the extent that the public has an interest in the outcome of this litigation, I find that the public has an interest in not being misled into thinking that the parties' pageants are one and the same, or that they are somehow related to each other, which is clearly not the case.

## B. "Cybersquatting" Claim

Plaintiff's "cybersquatting" claim arises under 15 U.S.C. § 1125(d), also known as the Anticybersquatting Consumer Protection Act ("ACPA"). The ACPA creates a right of action against

a person or entity that registers an internet domain name in bad faith, using someone else's protected mark.

The ACPA was enacted in 1999 to protect consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000). To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark. *See* 15 U.S.C. § 1125(d)(1)(a); *Webadviso v. Bank of America Corp.*, 448 Fed.Appx. 95, 97 (2d Cir. 2011), *petition for cert. filed*, Jan. 24, 2012 (No. 11-8561).

Given the Court's findings with respect to the trademark claim, it is unnecessary to address this claim at length, at this juncture. As set forth in more detail in the Conclusion below, the Court preliminarily enjoins defendants from using the "Miss United States of America" and similar marks, and that injunction extends to the use of such marks on the internet as well as in other media. Even leaving aside plaintiff's ACPA claim, then, the Court would enjoin defendants from continuing to use the internet domain name www.missunitedstatesofamerica.com, since that internet address incorporates defendants' allegedly infringing mark.

## CONCLUSION

Plaintiff's motion for a preliminary injunction (Dkt. #12) is granted. Defendants are hereby enjoined from using the marks "Miss United States of America," "Mrs. United States of America," "Miss Junior Teen United States," "Miss Teen United States of America," or "Mrs. United States of America Pageant," and from using the internet domain name "missunitedstates.com," in any way during the pendency of this litigation and until further order of the Court.

Defendants' motion to dismiss for lack of personal jurisdiction (Dkt. #18) is denied.

Plaintiff's motion for an order denying defendants' motion to dismiss or in the alternative for leave to conduct jurisdictional discovery (Dkt. #24) is denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
July 13, 2012.